UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

THOMAS J. WEGA,

                        Plaintiff,                06-CV-6375

            v.                                    **DECISION**
                                                  **and ORDER**
CENTER FOR DISABILITY RIGHTS,

                        Defendant.

_____

## **INTRODUCTION**

Plaintiff Thomas J. Wega ("plaintiff" and/or "Wega"), brings this action pursuant to the Americans With Disabilities Act, 42 U.S.C. §12100, *et seq.* ("ADA") claiming that defendant Center for Disability Rights ("CDR") unlawfully discriminated against him on the basis of a disability. Specifically, plaintiff alleges that he is disabled under the ADA as a result of residual effects of a cerebral vascular accident sustained in 1994; that CDR failed to accommodate his condition during the time of his employment; and that he was unlawfully terminated from his employment because of his condition.

Defendant denies plaintiff's claims, and alleges that plaintiff failed to request any reasonable accommodation, and that his termination of employment was not a result of any discriminatory animus. In addition, defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on grounds that plaintiff has failed to state a cause of action for discrimination. Specifically, defendant contends that

Wega has failed to establish that he is disabled under the terms of the ADA; has failed to establish that he requested and was denied a reasonable accommodation for his condition; and that CDR had reasonable business justification for terminating Wega's employment. Plaintiff opposes defendant's motion and cross-moves for summary judgment arguing that he is a qualified individual with a disability within the meaning of the ADA and that defendant failed to accommodate plaintiff during his employment. Moreover, plaintiff asserts that there are questions of fact as to the scope and range of discriminatory harassment and abuse plaintiff suffered while employed with CDR.

For the reasons set forth below, I grant defendant's motion for summary judgment, and deny plaintiff's cross-motion for summary judgment.

## BACKGROUND

At the outset, this Court must review the requirements of the Local Rules of Civil Procedure. Local Rule 56 provides: "In any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, there shall be annexed to the notice of motion "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." See W.D.N.Y. Loc. R. Civ. P. 56.1(a). "The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended

that there exists a genuine issue to be tried." See id. 56.1(b). In short, the moving party must set forth the material facts that it contends are not in dispute, whereas the non-moving party must then set forth the material facts that he contends are in dispute (i.e., material facts as to which she contends that there is a genuine issue). CDR has complied with both rules. See Def.'s Statement of Material Facts, Doc.# 58 ("SOMF") and Def.'s Response to Plaintiff's Statement of Material Facts Pursuant to Rule 56.1., Doc.# 78 ("Responding Statement").

Plaintiff, however, appears to have only partially complied with the Local Rules by submitting a "Statement of Material Facts Raising Genuine Issues of Fact For Trial" ("Hybrid Statement").[1] See Doc.# 74.3. Plaintiff's Hybrid Statement failed to specifically controvert the defendant's SOMF as required by Loc. R. Civ. P. 56.1(b) and (d).[2] Although plaintiff's Hybrid Statement sets forth some facts that appear to somewhat contradict defendant's SOMF and at the same time setting forth his own version of undisputed facts under 56.1(a), it nonetheless includes facts that are contained in defendant's SOMF i.e., facts about which there is no disagreement

---

[1]Such failure to abide by Loc. Rule 56 does not "streamline the consideration of summary judgment motions by freeing [this Court] from the need to hunt through voluminous records without guidance from the parties." See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir.2001) (discussing Rule 56.1 of the Loc. Rules of Civ. Proc. for the Southern and Eastern Districts of New York which is essentially the same as Loc. Rule 56).

[2]In this regard, Rule 56.1(d) provides that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)," with citations identifying "with specificity" the relevant page or paragraph of the cited authority. See id. R. 56.1(d).

and that create no genuine issue of material fact. Consequently, plaintiff's Hybrid Statement has the effect of causing confusion and obscuring the record. Further, it fails to specifically set forth which facts create a genuine issue of material fact--as opposed to a recitation of all the alleged facts. Since plaintiff has only partially complied with Rule 56.1(b) and 56.1(d), the third paragraph of Rule 56.1 comes into play. It reads: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless* controverted by the statement required to be served by the opposing party." See id. R. 56.1(c) (emphasis added).

As this Court held in <u>Kuchar v. Kenmore Mercy Hosp.</u>, 2000 WL 210199, at *1 (W.D.N.Y.2000) "[w]hile the consequence of this miscue is minimal given the general consensus between the parties [as shown by defendant] as to the constituent facts of this case, where a discrepancy exists this Court is obligated to and will 'deem admitted' the [moving party's] version of the facts... [although] the Court is [also] obligated to and will believe the [non-moving party's] evidence and all justifiable inferences will be drawn in his favor."[3] In view of Rule 56.1(c), the relevant

---

[3]See <u>Holtz</u>, 258 F.3d at 73-74 ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules"); cf. <u>Covelli v. Nat'l Fuel Gas Distrib. Corp.</u>, 2001 WL 1823584, at *1 (W.D.N.Y.2001) (holding that the district court "may, but is not required to, search the record for evidence which the party opposing summary judgment fails to point to in his Loc. Rule 56 statement. Inasmuch as the citations to the record in defendant's Statement support its factual assertions, this Court declines to search the record in an attempt to find evidence contradicting such when plaintiff has failed to do so....") (citations omitted).

facts that the court deems undisputed, based on the Amended Complaint, the parties' 56.1 Statements (as limited by invocation of the Local Rule), and other materials submitted in connection with defendant and plaintiff's motions for summary judgment, are as follows:

Plaintiff suffered a stroke in March 1994. See SOMF, ¶1. In October 1994, plaintiff underwent a comprehensive neuro-psychological evaluation performed by Dr. Peter B. Sorman, Ph.D. ("Dr. Sorman"). See id., ¶3. Dr. Sorman's report dated November 3, 1994 ("November 1994 Report") found that plaintiff had "superior abilities" with respect to intellectual functioning. For instance, general intelligence and verbal intellectual capacities were in the high average range while the nonverbal intellectual capacities was in the average range. See id., ¶4.[4] With regard to attention and coordination, plaintiff was within average range. See id., ¶5. A sensory-perception examination revealed that all of plaintiff's sensory organs were within normal limits. See id. In terms of language and academic abilities the November 1994 Report showed that plaintiff had "no apparent word finding difficulties" and his

---

[4]The November 1994 Report indicates that plaintiff had "[v]ery superior abilities...for fund knowledge. Superior abilities...for verbal abstract reasoning. High average functioning...for vocabulary, mental arithmetic calculations requiring sustained mental control, knowledge of social convention, and visual sequencing of social information. Mr. Wega scored within the average range for visuospatial synthesis of complex design. Low average functioning...for immediate auditory sequential memory digits, visual attention to relevant features in the environment[.]" See Affirmation of Matthew J. Fusco ("Fusco Aff."), ¶4, Ex. C.

academic capabilities are commensurate with his level of education. See id.

The report further found that plaintiff demonstrates "superior verbal abstraction capabilities" in terms of new learning ability. See id. In addition, the November 1994 Report summarized Dr. Sorman's examination of plaintiff by finding that he is "functioning in the high average range of general intelligence with a statistically significant difference noted between verbal and nonverbal intellectual capacities, the latter within average range....Mr. Wega...has retained very superior fund of general knowledge and high average vocabulary, mental arithmetic calculations and verbal abstraction capacities in the superior range....Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." See id., ¶6. Indeed, on many of the factors tested, plaintiff scored above average. See Fusco Aff., Ex. C.

At the time of his stroke, plaintiff was employed as the Director of Health and Safety Services for the American Red Cross ("Red Cross"). See id., ¶7. Within months after the stroke, plaintiff returned to work but he continued to receive physical therapy for problems with his leg. See id., ¶2. In 1998 plaintiff

was terminated from his position at the Red Cross. <u>See</u> <u>id.</u>, ¶7.[5] In 1999, plaintiff was hired by the American Heart Association ("AHA") as Vice-President for Health Admissions. <u>See</u> <u>id.</u>, ¶8. However, in early 2002 plaintiff was placed on a performance improvement plan by the AHA. In seeking assistance from VESID, plaintiff received a job coach to assist him at work. Plaintiff's VESID counselor, Laura Mass referred him back to Dr. Sorman for a re-evaluation in February 2002. <u>See</u> <u>id.</u>, ¶11.

Dr. Sorman's report dated February 11, 2002 ("February 2002 Report") revealed that plaintiff's vocabulary function were in the high average range in terms of his intellectual abilities. In addition, his "non-verbal reasoning was assessed at...average capacity" and his "IQ composite...is at the upper end of the average range." <u>See</u> <u>id.</u>, ¶12. Plaintiff also exhibits average "working memory" and he "still exhibits intellectual capacities in the average-to-above average range with well-developed verbally mediated skills." <u>See</u> <u>id.</u> Essentially, the February 2002 Report concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." <u>See</u> <u>id.</u> The report however indicated that "[m]ulti-tasking...may present a challenge as will issues such as organization and time management of

---

[5]Prior to Wega's termination from the Red Cross, he sought assistance from the NY State Vocational and Educational Services for Individuals with Disabilities ("VESID") concerning his problems at work.) <u>See</u> <u>id.</u>, ¶10.

responsibilities." See id.[6] One of the recommendations in the February 2002 Report was that plaintiff receive the assistance of a job coach. See id., ¶13. In this regard, plaintiff had at least ten job coaching sessions with Ray Connor, a coach provided through VESID from mid-April through mid-May 2002. See id. Despite the services of the job coach, plaintiff was terminated from his employment at the AHA in either May or June 2002. See id., ¶14.

In the fall of 2002, plaintiff applied for the position of Director of Administration at the CDR. See id., ¶15. Plaintiff's cover letter indicated that he suffered from a stroke but had made a "remarkable recovery." See id., ¶15. In fact, plaintiff testified at his deposition that at no time during his employment with CDR did he ever request an accommodation regarding either his physical or mental limitations as a result of his 1994 stroke. See id., ¶16. In December 2002, CDR hired plaintiff as the Director of Administration and he held that title until April 2004. See id., ¶18. As Director of Administration plaintiff had two main areas of responsibility, namely the finances of the organization and overall human resource guidance. See Affidavit of Bruce Darling ("Darling Aff."), ¶23. However, throughout the fall of 2003 and well into 2004 plaintiff had performance problems handling the financial

---

[6]In a letter addressed to his primary care physician, Dr. Marc Berliant, dated August 12, 2002, plaintiff described that he has "time and organizational management deficiencies" and was first demoted and then later terminated from the AHA. See id., ¶9.

responsibilities of his job as seen by his lack of knowledge of CDR's funding streams, as exhibited by his inability to complete major tasks[7] and as shown by plaintiff's failure to file the organization's taxes in 2003.[8] See SOMF, ¶17. Plaintiff's title changed in April 2004 to Director of Human Resources ("HR Director") and his financial responsibilities with respect to CDR were taken away from him. See id., ¶18. He received no reduction in pay and still participated in the management team. See id.[9] In August 2004, CDR terminated plaintiff from his employment for poor performance.[10] See id., ¶19.

Plaintiff's counsel asked Dr. Sorman to evaluate plaintiff in 2007 and to provide an independent medical evaluation relating to his condition. See Hybrid Statement, Third. Dr. Sorman's August

---

[7] One of the tasks that was not getting done was responding to Finger Lakes Developmental Disabilities Service Office, one of CDR's major funders with respect to specific concerns raised about services provided to an individual client named Joe McNulty. On August 22, 2003, Darling sent plaintiff an e-mail asking to see the McNulty letter. After numerous drafts and correspondence back and forth between plaintiff and Darling, the final version of the letter was not completed until May 2004. At this time, Darling had taken over the writing of the letter himself. See Darling Aff., ¶¶33-37.

[8] During plaintiff's fifteen months of being responsible for the finances of CDR, it was learned that he did not take steps to make sure that CDR filed its taxes in 2003. See Darling Aff., ¶53.

[9] As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. See Darling Aff., ¶55. According to Darling, at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. See Darling Aff., ¶58. It became apparent that plaintiff had simply thrown himself into the paperwork and was spending all his time filing and CDR did not need to pay someone a HR Director's salary to have them be a file clerk. See id., ¶63.

[10] A month later, plaintiff informed his physician, Dr. Berliant by letter that this was the third job where he was unable "to do the job consistently well enough for my employer." See id., ¶20.

2007 Report ("August 2007 Report") indicates that his findings are consistent with data contained in his November 1994 Report. See Sorman's August 2007 Report, at 5. With respect to general intelligence, plaintiff was in the high average range and his IQ was in the average range. See id., at 4. The report further found that plaintiff's strengths consisted of "knowledge of vocabulary definitions and verbal abstract reasoning." See id. "High average knowledge was noted for: mental arithmetic calculations, fund of knowledge, and ...nonverbal reasoning." See id. Dr. Sorman was asked by plaintiff's counsel to give an opinion as to whether "[f]rom the time period of 12/02/02 until 08/13/04 when plaintiff was employed at the [CDR]...he [was] 'Successfully disabled within the meaning of the [ADA], and that he suffered from three or more functional disabilities affecting a major life activity.'" See id., at 5. Dr. Sorman opined that "with a reasonable degree of neuropsychological certainty, [plaintiff] has been disabled (since the onset of his stroke in March 1994), [and]...during the time frame as well from 12/02/02 through 08/13/04." See id.

## DISCUSSION

### I.    Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(c). A genuine issue of material

fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted). The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotation marks omitted), but must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. See Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed.R.Civ.P. 56(c)).

## II.  Timeliness of Plaintiff's Submissions

Defendant filed its Motion for Summary Judgment on September 30, 2008 pursuant to Magistrate Judge Marion Payson's Amended scheduling Order dated March 20, 2008 ordering that all dispositive motions were to be filed no later than September 30, 2008. See

Fusco Affidavit dated Feb. 12, 2009 ("Fusco Aff. II"), ¶4. Pursuant to the Local Rules, plaintiff had thirty days to respond to the summary judgment motion filed by CDR. See W.D.N.Y. Loc. R. Civ. P. 56.1(e). Plaintiff did not respond to CDR's motion within thirty days, nor did plaintiff file a formal motion before the Court seeking an extension of the date by which opposition papers were to be due. See Fusco Aff. II, ¶¶7-11. Instead, on November 5, 2008, five days after plaintiff's opposition papers were due, plaintiff filed an affidavit with the Court requesting new scheduling dates. See id., ¶13, Ex.B. Plaintiff requested for an extension of fact discovery before Judge Payson and for an "extension of deadlines for answering Defendant's pending Motion for Summary Judgment and for submission of Plaintiff's own Motion for Summary Judgment to January 15, 2009." See id.

Defendant argues that to date, plaintiff's untimely request has not been granted and as such plaintiff's submissions are in violation of Local Rule 56.1 and must be denied. See id., ¶22. Plaintiff contends that his summary judgment motion is timely under an extension application granted by this Court dated November 19, 2008. See Thomas Hartzell Affirmation dated January 14, 2009 ("Hartzell Aff."), Sixth and Doc.# 69. Courts in this district have stricken papers where parties have failed to follow Local Rules and recognized established deadlines. See Lewis v. FMC Corp., 2008 WL 4500185, at * 1 (W.D.N.Y.2008). Here, the Court's November 19, 2008

Order states that "plaintiff's motion for an extension of time to respond to defendant's motion for summary judgment is granted." See Doc. #69. However, the Order further indicated that counsel would be notified of a revised briefing schedule for defendant's summary judgment motion following Judge Payson's issuance of a decision on the discovery motions pending before her.[11] Notwithstanding this Order, and before Judge Payson issued her decision on the discovery motions,[12] plaintiff filed his motion for summary judgment on January 15, 2009. The Court finds that plaintiff has ignored the Court's orders and the established deadlines. However, based on the undisputed evidence, as reflected in the papers submitted by the parties, the Court grants summary judgment in favor of CDR, thus rendering plaintiff's non-compliance as moot.

## III. **Retroactive Application of the ADA Amendments**

Because plaintiff's cross-motion includes portions of the ADA Amendments Act of 2008, Pub.L. No. 110-325 ("ADA Amendments"), which implies that it is plaintiff's belief that the ADA Amendments

---

[11]Courts require that parties adhere to scheduling orders and Fed.R.Civ.P. 16(b) provides that when the court has filed a Rule 16 scheduling order, it may properly require that good cause be shown before it is modified. See Covington v. Kid, 1999 WL 9835, at *3 (S.D.N.Y.1999). In this case, plaintiff has ignored Judge Payson's Amended Scheduling Order without either offering good cause or receiving consent from the Court. The Amended Scheduling Order in this case called for all factual discovery to be completed by August 11, 2008 and all dispositive motions to be filed by September 30, 2008. See Fusco Aff. II, ¶4. However, on September 11, 2008 plaintiff filed an affidavit seeking an order extending discovery and the date by which all dispositive motion were due. See id. Judge Payson denied the request to extend discovery on October 29, 2008, and informed plaintiff during oral argument that if he wished to extend the time to file dispositive motions, he should file a motion before this Court. See id., ¶¶9-11.

[12]Judge Payson denied plaintiff's motions for extension of time to complete discovery on August 31, 2009.

should apply to his claims, the court first examines whether the ADA Amendments would apply retroactively.[13]

When a case implicates a federal statute enacted after the events alleged in the action, the court will not apply the new statute where it would have retroactive effect (i.e., where it would increase a party's liability for past conduct or impose new duties with respect to transactions already completed) absent clear congressional intent favoring retroactivity. See <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 280 (1994) (case relating to the Civil Rights Act of 1991 where the Supreme Court discussed whether statutory amendments should be applied to cases arising from events predating enactment of the amendments). In <u>Landgraf</u>, the Court stated that where, as here, a statute is not explicit as to its retroactivity, a court "must determine whether the new statute would have retroactive effect" as to the case before it. <u>See</u> 511 U.S. at 280. In other words, it must ascertain whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." <u>See</u> <u>id.</u> If so, the court must apply the "traditional presumption" that the statute

---

[13]Among other changes, the ADA Amendments significantly expand the scope of the ADA's definition of disability. The bill's "Findings" and "Purposes" sections explain that the changes are intended to reject some of the limitations imposed by the Supreme Court's holdings in <u>Sutton v. United Air Lines</u>, 527 U.S. 471 (1999), and <u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184 (2002), which Congress felt had "narrowed the broad scope of protection intended to be afforded by the ADA." <u>See</u> ADA Amendments §2.

"does not govern absent clear congressional intent favoring such a result." see id.[14]

Application of the ADA Amendments to this case would cause a retroactive effect by placing a new requirement upon defendant which could potentially increase defendant's liability for past conduct and impose new duties with respect to transactions already completed.[15] See Landgraf, 511 U.S. at 280. Additionally, the ADA Amendments lack clear congressional intent favoring retroactive application. To the contrary, the ADA Amendments indicate a preference for prospective application–"This Act and the amendments made by this Act shall become effective on January 1, 2009." See ADA Amendments, §8; see also E.E.O.C. v. Agro Distrib. LLC, 555 F.3d 462, 2009 WL 95259, at *8 n. 8 (5th Cir.2009) ("Congress recently enacted the [ADA Amendments], but these changes do not apply retroactively." (citation and quotation signals omitted)). Because retroactive application of the ADA Amendments to this case

---

[14]In Landgraf's companion case, Rivers v. Roadway Express, the Court examined a situation directly analogous to that presented by the ADA Amendments--namely, whether to retroactively apply a part of the Civil Rights Act of 1991 which Congress had enacted in response to a Supreme Court decision that had narrowed the applicability of the preexisting civil rights statute. See 511 U.S. 298 (1994). The Court held that "[e]ven when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear" before the statute can be retroactively applied. See id. at 313.

[15]As discussed below, there is a serious question as to whether plaintiff has shown that he is disabled within the meaning of the ADA as it stood prior to the ADA Amendments. To the extent the Court would reach a different conclusion under the amended statute, the amendments would clearly have the effect of "increas[ing] a party's liability for past conduct" by imposing on defendant the restrictions the ADA places on an employer as to its treatment of a disabled employee. Application of the ADA Amendments would therefore have a "retroactive effect," and the Court must give effect to the presumption against application of the statute, and apply the law as it existed before the amendments.

would result in a retroactive effect and the ADA Amendments do not clearly favor retroactivity, the ADA Amendments shall not be applied retroactively to plaintiff's claim.[16]

## IV. **ADA Discrimination**

### A. Standards

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to...the hiring, advancement, or discharge of employees." 42 U.S.C. §12112(a); see Sutton, 527 U.S. at 476. In ADA discrimination cases, the plaintiff has an initial burden of alleging a prima facie case. See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir.1998). There are four elements that a plaintiff must show to make out a prima facie case of discrimination under the ADA: (1) the employer is subject to the ADA; (2) the plaintiff suffers from a disability as defined by the ADA; (3) the plaintiff is otherwise qualified to perform the tasks required of the job; and (4) the plaintiff suffered an adverse employment action as a result of his disability. See id. at 869-70; see also Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.2001); Cusack v. News America Marketing In-Store Servs.,

---

[16]For similar reasons, other courts that have addressed the retroactivity of the ADA Amendments have concluded that they do not apply retroactively. See, e.g., Geoghan v. LIRR, 2009 WL 982451, at *8-9 (E.D.N.Y.2009); Kravar v. Triangle Servs., 2009 WL 805807, at *4 n. 3 (S.D.N.Y.2009); Moran v. Premier Educ. Group, 2009 WL 507505, at *7 (D.Conn.2009); Schmitz v. Louisiana, 2009 WL 210497 (M.D.La.2009); Rudolph v. U.S. Enrichment Corp., 2009 WL 111737, at *4-6 (W.D.Ky.2009) (ADA Amendments do not apply retroactively and thus court applied the statute as it existed before the amendments).

L.L.C., 2008 WL 2663001, at *4 (S.D.N.Y.2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination. See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d 68, 72 (2d Cir.1999). If the defendant meets its burden, it then falls to the plaintiff once again to demonstrate that the defendant's proffered explanation is a pretext for termination based on disability. See id.

The ADA also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." See 42 U.S.C. § 12112(b)(5)(A); see also Lovejoy-Wilson v. NOCO Motor Fuel, 263 F.3d 208, 216 (2d Cir.2001). Thus, a plaintiff can also make out a prima facie case of discrimination under the ADA by showing that (1) he is an individual with a disability as defined by the ADA; (2) an ADA-covered employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the job sought; and (4) the employer refused to make such reasonable accommodation. See id. Here, defendant claims that plaintiff cannot establish a prima facie case of discrimination. See Def. Br. at 4. Accordingly, the Court begins by examining whether plaintiff meets the four-part test set forth in

17

Ryan and Lovejoy-Wilson. Since there is no dispute that the CDR is an entity covered by the ADA, the Court addresses the question of whether plaintiff suffers from a disability under the meaning of the ADA.

### B. Plaintiff has Failed to Establish a Prima Facie Case of Disability Discrimination

It is noteworthy that plaintiff failed to respond to CDR's contention that he was not disabled within the meaning of the ADA, as interpreted prior to the January 1, 2009 ADA Amendments. Plaintiff has not rebutted defendant's arguments regarding the issue of disability as it relates to the pre-ADA Amendments. I find that the plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, and therefore, cannot state a prima facie case of discrimination. It is well settled under federal law that the mere presence of a medical condition or impairment suffered by a plaintiff does not establish that the plaintiff is disabled under the ADA. See Toyota, 534 U.S. at 195 ("[m]erely having an impairment does not make one disabled for purposes of the ADA"). Rather, to establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that "substantially limits one or more major life activities...." 42 U.S.C. § 12102(2)(A). "Major life activities" are defined in the regulations promulgated by the EEOC as "functions such as caring for one's self, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See 45 C.F.R. § 84.3(j)(2)(ii).

To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." See Toyota, 534 U.S. at 185. Moreover, "[t]he impairment's impact must also be permanent or long term." See id.; see also 29 C.F.R. §1630.2(j)(1)(i)-(ii) (A major life activity is substantially limited when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can...perform [the] activity.") Finally, the determination of whether or not a person suffers a disability under the ADA "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. See Sutton, 527 U.S. at 483. Instead, courts are to look to "the effect of [an] impairment on the life of the individual." See 29 CFR pt. 1630, App. §1630.2(j); see also Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 151 (2d Cir.1998)(disability determinations to be made on an individualized case-by-case basis).

In the instant case, plaintiff has failed to identify any major life activity that was substantially impaired by his stroke. Although plaintiff's amended complaint seems to allege that he

suffers from impairments due to a stroke he suffered in 1994 that fall into three categories including physical limitations of the left side resulting in a limp, verbal communication abilities and cognitive limitations, these impairments do not in and of itself bring plaintiff within the definition of a qualified individual under the ADA. See Mitchell v. Girl Scouts of the U.S.A., 2003 WL 22705121, at *5 (S.D.N.Y.2003) (A showing of an impairment alone is insufficient to qualify as a disability) (citing to Toyota, 534 U.S. at 195). With respect to his left side restrictions, plaintiff testified that neither his left shoulder weakness nor the problems with his left leg affected his ability to carry out his duties at the CDR. See Fusco Aff., Ex. G., at 26-27. In fact, Wega testified that he never requested any accommodation from the CDR concerning either his left leg or shoulder. See id., at 27.[17]

The amended complaint also states that plaintiff has "limitations of verbal communication ability." See Fusco Aff., Ex. A. When asked at his deposition what verbal communication problems he had, plaintiff's only response was "thinking of the right word at the right time sometimes is a difficulty for me." See id., Ex.

_____

[17]As it relates to Wega's limitations concerning walking and left side weakness, during his time working at CDR, plaintiff regularly walked at least a block, he never used a wheelchair, crutches or a walker, but did use a cane on occasion. See Fusco Aff., Ex. G., at 26. Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time--much less than the plaintiff can walk--do not constitute substantial limits on walking. See, e.g., Mitchell, 2003 WL 22705121, at *6 (finding that inability to do a "substantial amount of walking ...while of course to an extent is limiting, does not rise to the level of a substantial limitation"); Rosa v. Brink's, Inc., 103 F.Supp.2d 287, 290 (S .D.N.Y.2000) (finding inability to walk for long period of time does not amount to substantial limitation); Butterfield v. New York State, 1998 WL 401533, at *9 (S.D.N.Y.1998) (finding plaintiff's trouble taking extended walks "simply does not, as a matter of law, constitute a sufficiently substantial limitation to allow his case to go to the jury on this point").

G., at 42. When asked if these limitations of verbal communications in any way kept plaintiff from performing the essential functions of his job at CDR, plaintiff responded with "I can't think of an instance at this time." See id. In addition, Dr. Sorman's November 1994 Report found that plaintiff had "superior abilities" with respect to intellectual functioning and that he retained very superior fund of general knowledge and high average vocabulary. See Fusco Aff., Ex. C. In terms of language and academic abilities the November 1994 Report also showed that plaintiff had "no apparent word finding difficulties." See id.

The February 2002 Report by Dr. Sorman concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." See id., Ex. D. Moreover, Dr. Sorman's August 2007 Report indicates that his findings are consistent with data contained in his November 1994 Report. Accordingly, plaintiff's complaint that his verbal communication limitations due to his stroke, which compromised his ability to maintain employment, does not establish the substantial impairment of a major life activity. The undisputed evidence, including plaintiff's testimony and the objective neurological testing reveal that any limitations on verbal communications that plaintiff suffered as a result of his stroke did not substantially impair any major life activity.

Plaintiff also claims that he is impaired due to "cognitive limitations, including memorial powers[.]" <u>See</u> Fusco Aff., Ex. A. However, plaintiff has come forward with no evidence to show that his cognitive limitations substantially limited his performance of any major life activity. <u>See</u> <u>Capobianco v. City of New York</u>, 422 F.3d 47, 57 (2d Cir.2005) (Inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is "unable to perform the variety of tasks central to most people's daily lives") (quoting <u>Toyota</u>, 534 U.S. at 200). Here, the evidence shows that Dr. Sorman found plaintiff to be average or above average in most of the cognitive categories which could be tested. <u>See</u> Fusco Aff., Exs.C & D and Sorman's August 2007 Report. Dr. Sorman also concluded that plaintiff is "functioning in the high average range of general intelligence....Mr. Wega...has retained very superior fund of general knowledge...mental arithmetic calculations and verbal abstraction capacities in the superior range....Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." <u>See</u> Fusco Aff., Ex.C. While plaintiff may claim that his cognitive impairments made performing his job functions difficult, based on the testing by the physician, it was not impossible.

In addition, the November 1994 Report and February 2002 Report never indicated that plaintiff could not return to work. Moreover, it was only when plaintiff's counsel requested that Dr. Sorman perform an independent medical examination did the doctor opine that plaintiff was "disabled (since the onset of his stroke in March 1994)[.]" See Sutton, 527 U.S. at 483 (determination of whether or not person suffers a disability under ADA "is an individualized inquiry" that does not rest on mere diagnosis of impairment). However, even the August 2007 Report did not indicate that plaintiff could not work. As a result, plaintiff has not shown how his condition substantially limits his major life activities. See 42 U.S.C. §12101(2)(A). Because plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, I find that he has failed to state a prima facie case of discrimination under the ADA, and therefore grant defendant's motion for summary judgment dismissing his claim under the ADA.

### C.    Reasonable Accommodation

To establish a reasonable accommodation claim under the ADA, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." See Graves v. Finch Pruyn & Co., Inc., 457 F.3d

181, 184 (2d Cir.2006) (citations omitted). Plaintiff contends that "CDR failed to recognize [his] 'subtle deficits' and offer a reasonable accommodation." <u>See</u> Pl. Br. at 9. However, "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." <u>See</u> <u>id.</u> at 184 (citations and quotation marks omitted). "[A]n employer has a duty reasonably to accommodate an employee's disability [only] if...the employer knew or reasonably should have known that the employee was disabled." <u>See</u> <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 135 (2d Cir.2008).

Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires...[and] does not include the 'marginal' functions of the position." <u>See</u> <u>Mitchell v. Washinetonville Cent. Sch. Dist.</u>, 190 F.3d 1, 8 (2d Cir.1999) (quoting 29 C.F.R. § 1630.2(n)(1)). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." <u>See</u> 42 U.S.C. § 12111(8); <u>see</u> <u>also</u> <u>Shannon v. New York City Transit Auth.</u>, 332 F.3d 95, 100 (2d Cir.2003) ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position") (citation and quotation

marks omitted). Other evidence of whether a particular function is essential includes, inter alia, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. <u>See</u> 29 C.F.R. 1630.2(n)(3); <u>Mitchell</u>, 190 F.3d at 8 n. 3.

Even assuming, arguendo, that plaintiff is disabled within the meaning of the ADA, plaintiff's claim fails. There is no indication from the record that plaintiff requested an accommodation from CDR and that CDR denied plaintiff a reasonable accommodation. Plaintiff does not dispute that he did not request an accommodation. In fact, plaintiff's deposition testimony reveals that he never made any request for an accommodation concerning his walking or weakness on his shoulder. <u>See</u> Fusco Aff., Ex.G, at 27. In addition, plaintiff repeatedly testified that he did not ask for any accommodations from CDR relating to any residual symptoms of his stroke. <u>See</u> <u>id.</u>, at 56-57, 64, 93-94. Plaintiff further testified that he was not "aware of any kind of accommodation at the time [he] was hired that [he] might need." <u>See</u> <u>id.</u>, at 57. Moreover, plaintiff did not inform anyone at CDR of his alleged verbal communication and cognitive limitations. Nor does he allege that they were in any way obvious. Plaintiff also failed to seek the assistance of a job coach despite the fact that he knew one was available to him through VESID.

Moreover, even if the court were to conclude that plaintiff's alleged cognitive disability was obvious, it is inaccurate to state

that defendant took no steps to accommodate him. <u>See</u> <u>Brady</u>, 531 F.3d at 134 (The Second Court took the opportunity to refine the general rule and "held that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious-which is to say, if the employer knew or reasonably should have known that the employee was disabled"); <u>Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.</u>, 588 F.Supp.2d 419, 425 (E.D.N.Y.2008) (subscribing to the legal position that it is unlawful for an employer to refuse to make reasonable accommodations to known physical and mental limitations) (citing <u>Brady</u>, 531 F.3d at 134)). Here, the affidavit of Darling demonstrates the he took a number of steps to train plaintiff by making task lists for him, by making out a spreadsheet for him so that he could understand how the CDR business works e.g. funding streams, and finally by reducing plaintiff's responsibilities while allowing him to still retain the title of director with a director's salary. <u>See</u> Darling Aff., ¶¶37, 39, 49-51.

In addition, plaintiff has not proffered any evidence to show that he could perform the essential functions of his job either as Director of Administration for CDR or as HR Director with or without a reasonable accommodation. Plaintiff was initially hired as Director of Administration for the CDR in December 2002. <u>See</u> SOMF, ¶18. The essential functions of this position include, inter alia, the oversight of both the finances of CDR and overall human resource guidance for approximately one hundred employees. <u>See</u>

Darling Aff., ¶23. The evidence shows that throughout the fall of 2003 and well into 2004, during plaintiff's time as Director of Administration, plaintiff had performance problems handling the financial responsibilities of his job as seen by his ignorance of CDR's funding streams, as exhibited by his inability to complete major tasks such as providing reports to the Board of Directors and as shown by plaintiff's failure to file the organization's taxes in 2003. As a result of plaintiff's inability to perform the financial aspects of his job, although it had no legal obligation to do so, defendant altered plaintiff's job functions and permitted him to focus solely on human resources responsibilities. See Graves, 457 F.3d at 187 (While "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation,...the ADA does not require creating a new position for a disabled employee") (citations omitted).

Plaintiff's title changed in April 2004 to HR Director and his financial responsibilities with respect to CDR were taken away from him. See SOMF, ¶18. However, he received no reduction in pay and still participated in the management team. See id. As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. See Darling Aff., ¶55. Darling indicated that

at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. <u>See</u> Darling Aff., ¶58. Plaintiff has not proffered any evidence showing that he could perform the essential functions of either a Director of Administration or HR Director with or without a reasonable accommodation, nor has plaintiff even suggested any accommodation that CDR could have provided to enable him to do so. Accordingly, defendant's motion for summary is granted, plaintiff's cross-motion is denied and plaintiff's failure to accommodate claim is dismissed.

<b><u>CONCLUSION</u></b>

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied. Plaintiff's Amended Complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca
Michael A. Telesca
United States District Judge

DATED:    Rochester, New York
          September 30, 2009